# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2008 MAR 10 AM II: 53

CLERK _____
SO. DIST. OF GA.

| | |
|---|---|
| JAMES W. CHRISTOPHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CV 106-133 |
| | ) |
| BARBARA BROCK, Nurse, and JAMES | ) |
| TINKER, Nurse, | ) |
| | ) |
| Defendants.[1] | ) |

## O R D E R

Plaintiff James W. Christopher, an inmate incarcerated at Augusta State Medical Prison located in Grovetown, Georgia when this action commenced, filed the above-captioned complaint pursuant to 42 U.S.C. § 1983. Plaintiff is proceeding *pro se* and *in forma pauperis*. The matter is now before the Court on cross motions for summary judgment. (Doc. nos. 26 & 31). Both motions are opposed. (Doc. nos. 31 & 34). For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED**, Plaintiff's motion for summary judgment is **DENIED**, this civil action is **CLOSED**, and a final judgment shall be **ENTERED** in favor of Defendants.[2]

---

[1] The Court lists Defendants names as they appear in Defendants' answer. (Doc. no. 22). The **CLERK** is **DIRECTED** to change the docket accordingly.

[2] The parties consented, in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. no. 30).

# I. STATEMENT OF FACTS

## A.    Plaintiff's Version

Plaintiff avers that, on March 4, 2005, after his parole was revoked, he was incarcerated at Augusta State Medical Prison ("ASMP"). (Doc. no. 1, p. 6). Prior to Plaintiff's arrival at ASMP, "Defendants were historically aware of [his] serious and critical medical needs for timely dialysis treatment . . . ." (Doc. no. 31, ¶ 3). Upon his arrival at ASMP, Plaintiff was examined by a nurse, "who only took his vital signs, blood-pressure, and temperature, then sent [Plaintiff] on to his assigned dormitory." (Id. ¶¶ 3 & 5). Plaintiff maintains that Defendant Tinker, a nurse at ASMP, who knew that Plaintiff last received dialysis treatment on March 3, 2005, scheduled Plaintiff to receive his next dialysis treatment on March 7, 2005. (Doc. no. 1, p. 6).

Plaintiff contends that, although he complained about his medical condition from March 4 through March 6, 2005, Defendant Brock, nurse manager at ASMP during the relevant period, and Defendant Tinker "wa[i]ved it off with no actions or notification to their supervisors . . . ." (Doc. no. 31, ¶¶ 7 & 15). According to Plaintiff, on March 5, 2005, Officer Streeter contacted the dialysis center after Plaintiff complained about pain and dizziness. (Doc. no. 1, p. 7). Plaintiff maintains that he was then escorted to the dialysis center, where Nurse Brown refused to provide dialysis treatment, although there were "several [dialysis] chairs available."[3] (Id. at 7-8). Plaintiff submits that, on March 6, 2005, his condition became critical, so he was transferred to the Medical College of Georgia

_____

[3]On June 18, 2007, the Court granted Plaintiff's motion to dismiss Nurse Brown as a Defendant in this case. (Doc. no. 25).

2

("MCG"). (Id. at 8). According to Plaintiff, he was not provided dialysis treatment while he was at MCG because "the hospital did not have anyone to run [him] on the machine." (Doc. no. 31, ¶ 18). Plaintiff also submits that, while he was at MCG, he was given nitroglycerin tablets because he was "at a substantial risk of a fatal heart attack." (Doc. no. 35, ¶ 1). Plaintiff concludes that, prior to March 6, 2005, Defendants failed to seek "a higher Doctor's opinion" concerning Plaintiff's delayed dialysis treatment. (Id. ¶ 6).

After Plaintiff returned to ASMP on March 7, 2005, he received his first dialysis treatment since March 3, 2007. (Doc. no. 31, ¶¶ 3-4). However, Plaintiff's dialysis treatment was prematurely-terminated because of "excessive bleeding."[4] (Id. ¶¶ 4 & 18). Plaintiff contends that, on March 7, 2005, he was not given a permanent dialysis schedule, and thus, he did not receive his next dialysis treatment until March 10, 2005. (Doc. no. 1, p. 10).

Plaintiff maintains that he underwent emergency vascular surgery on May 25, 2005 to address blood clotting caused by Defendants' failure to provide timely dialysis treatment. (Doc. no. 31, ¶ 16). Plaintiff also contends that he continues to suffer physical pain, headaches, swelling, "dizzy spells," blurred vision, "major fatigue," and vomiting. (Id. ¶ 17; doc. no. 35, ¶ 6). Although Plaintiff provides excerpts from his March 7, 2005 MCG medical records and Georgia Department of Corrections ("GDC") medical records (doc. no. 31, pp. 10-38), he has failed to provide the Court with any verifying medical evidence in support of the conclusory allegations that, as a result of Defendants' failure to provide him with timely and adequate dialysis treatments, he had to be transferred to MCG for emergency treatment

___

[4]Plaintiff maintains that whenever his dialysis treatment was prematurely-terminated, it was the result of a decision made by Defendants. (Doc. no. 31, ¶¶ 4 & 22).

in March 2005, that he had to undergo emergency vascular surgery in May 2005, and that he continues to suffer detrimental effects.

**B.    Defendants' Version**

At all times relevant to this case, Defendant Tinker was employed as a "Charge Nurse," licenced by the State of Georgia, at ASMP, and Defendant Brock was employed as the "Nurse Manager," licenced by the State of Georgia, at ASMP. (Doc. no. 27, Ex. A, Tinker Aff., ¶¶ 1-2, Ex. B, Brock Aff., ¶¶ 1-2; doc. no. 28, ¶ 6). Defendants state that, on March 4, 2005 when Plaintiff was incarcerated at ASMP, they were familiar with Plaintiff as a dialysis patient because he was previously incarcerated at ASMP.[5] (Id., Ex. A, ¶ 4, Ex. B, ¶ 4). Upon Plaintiff's arrival at ASMP, an intake nurse noted that Plaintiff voiced no complaints, that his vital signs were stable, that he weighed 140.4 pounds, that he had no profiles or limitations, and that he was prescribed medication. (Id., Ex. A, ¶ 5, Ex. B, ¶ 5). The intake nurse also notified the dialysis clinic of Plaintiff's arrival and ordered a renal diet for Plaintiff. (Id.).

Defendants contend that, while Plaintiff was in the dialysis clinic on Friday, March 4, 2005, he laughed and joked, informed the staff that he received dialysis treatment on March 3, 2005, and indicated his desire to remain on the "Tuesday/Thursday/Saturday" dialysis schedule ("T/T/S Schedule"). (Id., Ex. A, ¶ 10). Defendant Tinker maintains that, on March 4, 2005, he informed Plaintiff that the T/T/S Schedule was full, that Plaintiff was placed on the "Monday/Wednesday/Friday" dialysis schedule ("M/W/F Schedule"), and that

---

[5]Defendant Tinker was the Charge Nurse in the dialysis clinic on March 4, 2005. (Doc. no. 27, Ex. A, ¶ 10).

Plaintiff's next dialysis treatment would be on Monday, March 7, 2005.[6] (Id. ¶ 11). According to Defendants, because Plaintiff requested to receive dialysis treatment on Saturday, March 5, 2005, Defendant Tinker informed Plaintiff that he would be called if a dialysis machine became available. (Id. ¶ 12).

Defendants contend that, on March 5, 2005, Plaintiff requested dialysis treatment after the clinic was closed for the weekend. (Id. ¶ 14). According to Defendants, Plaintiff was examined by a PA, who assessed Plaintiff as stable with no evidence of fluid overload, noted "[Plaintiff] skipped meds today," advised Plaintiff to take his medication and avoid excessive fluid intake, and discharged Plaintiff. (Id.). Defendants maintain that, on the evening of Sunday, March 6, 2005, Plaintiff complained about difficulty breathing. (Id., Ex. A, ¶ 15, Ex. B, ¶ 15). Defendants submit that Plaintiff was then examined by a nurse and referred to a PA, who noted "mild distress" before calling a physician. (Id., Ex. A, ¶¶ 15-16, Ex. B, ¶ 15). Defendants explain that, in accordance with the physician's authorization, Plaintiff was transferred to MCG shortly after midnight, March 7, 2005. (Id.). Plaintiff was examined, directed to continue medication, instructed to receive dialysis treatment later that day, and discharged from MCG. (Id.; Ex. A, ¶¶ 16-17, Ex. B, ¶ 15).

---

[6]According to Defendants, the ASMP dialysis clinic had the capability to perform 33 dialysis treatments on Mondays, Wednesdays, and Fridays, and the capability to perform 20 dialysis treatments on Tuesdays, Thursdays, and Saturdays in 2005. (Doc. no. 27, Ex. A, ¶ 8, Ex. B, ¶ 8). The Saturday dialysis schedule was generally "very full" and the dialysis clinic was closed on Sundays. (Id.). When the dialysis clinic lacked the capability to perform a necessary dialysis, the inmate would be referred to a physician or physician's assistant ("PA"), who determined whether the inmate could wait for the next opening or required transfer to a local hospital. (Id., Ex. A, ¶ 9, Ex. B, ¶ 9).

Upon return to ASMP on March 7, 2005, Plaintiff was examined by a PA, who noted Plaintiff was "in no acute respiratory distress," advised Plaintiff of MCG's recommendations, and notified Plaintiff that he was scheduled for dialysis treatment later that day. (Id., Ex. A, ¶ 18). According to Defendants, when Plaintiff arrived at the dialysis clinic, he exhibited no signs of distress.[7] (Id. ¶¶ 19-20). Defendants contend that pre-dialysis examination confirmed that Plaintiff's blood chemistry was good and that he was not uremic. (Id., Ex. A, ¶ 20, Ex. B, ¶ 15). Thereafter, Defendant Tinker began dialysis treatment, and Plaintiff experienced a cramp indicating that almost all excess fluid had been removed.[8] (Id., Ex. A, ¶ 21). Defendants submit that Plaintiff requested premature-termination of his dialysis treatment because his arm was sore and he was hungry. (Id.). Defendants conclude that, although Defendant Tinker terminated Plaintiff's dialysis treatment approximately thirty minutes early, Plaintiff was assessed as stable during his post-dialysis examination. (Id.). According to Defendants, Nurse Brown presented Plaintiff with a "Refusal of Treatment" form, which he refused to sign, and thus, Nurse Brown signed the form.[9] (Id.).

[7]As a result of Plaintiff's March 7, 2005 transfers to and from MCG, Plaintiff's dialysis treatment was delayed eight hours. (Doc. no. 27, Ex. A, ¶ 19). "Normally, the clinic staff would not begin dialysis on a patient at [2:15 p.m.]. However, [Defendant Tinker] made a special exception for [Plaintiff] . . . ." (Id.).

[8]Defendant Brock's investigation, in response to a memo received from the Deputy Warden of Care and Treatment, confirmed that Plaintiff received dialysis treatment on March 3, 2005 and that he was scheduled to receive his next dialysis treatment on March 7, 2005, which was the next available slot. (Doc. no. 27, Ex. B, ¶ 17). Defendant Brock also ascertained that, during his March 7, 2005 dialysis treatment, Plaintiff experienced mild cramping, which indicated that he was at his "dry weight" and that no more fluid could be removed. (Id.).

[9]The ASMP staff is required to honor an inmate's request to discontinue dialysis treatment and to ask the inmate to sign a "Refusal of Treatment" form. (Doc. no. 27, Ex. A,

6

Defendants contend that Plaintiff was next scheduled to receive dialysis treatment on March 9, 2005, but that he requested to change dialysis schedules. (Id., Ex. A, ¶ 22, Ex. B, ¶ 10). According to Defendant Brock, Plaintiff was notified that an opening on the T/T/S Schedule was available, and Plaintiff indicated that he wanted to change dialysis schedules, even though it meant waiting until March 10, 2005 for his next dialysis treatment. (Id., Ex. B, ¶ 10). Defendants maintain that Plaintiff's dialysis schedule was changed and that Defendant Tinker was notified of the change. (Id.). Plaintiff received dialysis treatments on March 10 and 12, 2005. (Id., Ex. A, ¶¶ 23 & 24).

Defendants contend that, at the time their motion for summary judgment was filed,[10] Plaintiff remained on the T/T/S Schedule at ASMP. (Id., Ex. A, ¶ 33, Ex. B, ¶ 12). According to Defendants, Plaintiff was "one of the healthiest dialysis patients [they have] ever seen" and his lab values were consistently "very good." (Id., Ex. A ¶¶ 33 & 38, Ex. B, ¶¶ 12 & 16; doc. no. 33, p. 1). Defendants maintain that Plaintiff did not require emergency treatment at MCG on March 7, 2005 and that he was not required to undergo cardiovascular surgery as a result of their actions. (Doc. no. 27, pp. 8 & 19). Defendants provide Plaintiff's March 7, 2005 MCG medical records and excerpts from his GDC medical records. (Id., Exs. A-1 & A-2). Defendants also submit Plaintiff's informal grievance related to his March 7, 2005 MCG transfer, the March 23, 2005 memo from the Deputy Warden of Care and Treatment, and Defendant Brock's response to the March 23, 2005 memo. (Id., Ex. B-1).

¶ 21). According to Defendants, Plaintiff prematurely-terminated dialysis treatment on approximately twenty (20) occasions from April 30, 2005 to May, 17, 2007. (Id. ¶ 34).

[10]Since Defendants filed their motion for summary judgment, Plaintiff has been released from ASMP. (Doc. no. 36).

7

## II. DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Applicable substantive law identifies which facts are material in a given case.[11] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929 F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot

---

[11]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

meet its burden at trial is not sufficient. Id. at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

**B.     Defendants Did Not Act with Deliberate Indifference**

Bearing the above standard in mind, Defendants are entitled to summary judgment. To survive Defendants' motion for summary judgment, Plaintiff must produce evidence from which a reasonable jury could conclude: (1) that Plaintiff had an objectively serious medical need, (2) that Defendants acted with deliberate indifference to that need, and (3) that Plaintiff's injury was caused by the Defendants' wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007) (citations omitted). Although the evidence in the record establishes that Plaintiff is a dialysis patient, he has not shown that Defendants acted with deliberate indifference to his serious medical need.

To show that Defendants were deliberately indifferent to his needs, Plaintiff must prove three things: (1) Defendants were subjectively aware of a serious risk to Plaintiff's health, (2) Defendants disregarded that risk, and (3) Defendants followed a course of action that was "more than gross negligence."[12] Id. at 1326-27 (citing Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam)). In addition, the prisoner plaintiff seeking to show that a delay in medical treatment amounted to deliberate indifference "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir.1994), abrogated in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002); see also Farrow v. West, 320 F.3d 1235, 1244 n.12 (11th Cir. 2003) ("In Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002), the Supreme Court criticized part of the qualified immunity analysis in Hill, but not Hill's analysis of what constitutes a serious medical need of prisoners.").

However, it should be recognized that the mere fact that a prisoner "may have desired [a] different mode[] of treatment" does not give rise to a claim for deliberate indifference. Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985). "Where a prisoner has received . . . medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments." Id. (citation omitted).

---

[12]When determining whether a course of action constitutes "more than gross negligence" in cases concerning increased injury due to the delay in providing medical care, the Eleventh Circuit has set out some factors to guide the analysis, including: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay. Goebert, 510 F.3d at 1327 (citing Hill, 40 F.3d at 1189).

Put another way, a mere difference in opinion between prison medical officials and the inmate as to the latter's diagnosis or course of treatment will not support a claim of cruel and unusual punishment. Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991); Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989).

Furthermore, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." West, 320 F.3d at 1243 (internal quotation and citation omitted). The Eighth Amendment does not mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good." Harris, 941 F.2d at 1510 (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980) (Bowen, J.)). As the Supreme Court has explained:

> [A]n inadvertent failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Thus, mere allegations of negligence or malpractice do not amount to deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir. 1999) (explaining that medical malpractice cannot form the basis for Eighth Amendment liability); Harris, 941 F.2d at 1505.

11

Although Plaintiff generally argues that Defendants were deliberately indifferent to his serious medical needs, he specifically complains that, because he was not provided with dialysis treatment immediately upon his arrival at ASMP, he had to be transferred to MCG on March 7, 2005 for emergency treatment and continues to suffer detrimental effects. Plaintiff also complains that, because dialysis treatments following his March 7, 2005 MCG transfer were prematurely terminated and postponed, he was eventually forced to undergo cardiovascular surgery and continues to suffer detrimental effects.

### 1. The Decision to Schedule Dialysis Treatment on March 7, 2005

Plaintiff argues that, because he did not receive dialysis treatment immediately upon his arrival at ASMP on March 4, 2005, he had to be transferred to MCG for emergency treatment on March 7, 2005. (Doc. no. 31, p. 3). Plaintiff submits that, despite his complaints and requests for dialysis treatment, Defendants refused to provide dialysis treatment, and thus, he had to be transferred to MCG when his condition became critical. (Doc. no. 1, p. 8). Defendants counter that Plaintiff did not require emergency dialysis treatment and that he suffered no ill effects from waiting a few days for treatment. (Doc. no. 27, p. 1; doc. no. 33, p. 1). Defendants submit that there was no substantial risk of harm, they did not know of any specific risk of harm, and they reasonably exercised professional judgment. (Doc. no. 27, pp. 15-20; doc. no. 33, p. 2).

First, it should be noted that Plaintiff has provided the Court with no verifying medical evidence in support of his contention that, as a result of Defendants' failure to provide him with timely dialysis treatment, he had to be transferred to MCG for emergency

12

treatment on March 7, 2005 and continues to suffer detrimental effects. Rather, the record demonstrates that Defendant Tinker simply exercised professional medical judgment--at no time did he subjectively know about a risk of serious harm to Plaintiff or disregard that risk.[13] As previously noted, Plaintiff received dialysis treatment on March 3, 2005. Upon Plaintiff's arrival at ASMP, Defendants were familiar with his medical condition and treatment history. (Doc. no. 27, Ex. A, ¶ 4, Ex. B, ¶ 4; doc. no. 31, p. 3). That day, Plaintiff was examined by an intake nurse, assessed as stable, and referred to the dialysis clinic. (Id., Ex. A-1, pp. 3-5). Later that day, Defendant Tinker, exercising medical judgment based upon experience and objective medical findings, determined that there was no risk associated with scheduling Plaintiff's first dialysis treatment on March 7, 2005.[14] (Id., Ex. A, ¶¶ 11-13, Ex. A-1, p. 9). Furthermore, the record lacks evidence suggesting that Defendant Brock participated in scheduling Plaintiff's March 7, 2005 dialysis treatment or that Defendants ignored Plaintiff's

---

[13]Plaintiff alleges, "[Defendants] have back[-]dated certain records to try to disprove [his] claims." (Doc. no. 31, p. 6). Defendants counter that the GDC is the custodian of Plaintiff's medical records and that there is no evidence to support Plaintiff's allegation. (Doc. no. 33, p. 9). Although Plaintiff's GDC medical records contain a "medical encounter" form, which appears to have an altered date (doc. no. 27, Ex. A-1, p. 6; doc. no. 31, p. 13), there is nothing in the record to support Plaintiff's conclusory allegation, as it relates to Defendants. Nevertheless, even assuming that the date on the "medical encounter" form (doc. no. 27, Ex. A-1, p. 6) was somehow altered, Plaintiff's GDC medical records clearly indicate that Plaintiff was examined by multiple healthcare providers from March 4 through 7, 2005. (Id., Ex. A-1, pp. 3-5 & 7-8). As such, the Court need not resolve this issue when addressing the merits of Defendants' motion for summary judgment.

[14]Defendant Tinker submits that "[he] knew from [his] previous experience . . . that [Plaintiff] was an extremely stable patient and had a strong ability to control his fluids." (Doc. no. 27, Ex. A, ¶ 10). Furthermore,"in [Defendant Tinker's] professional opinion, because [Plaintiff] had just had dialysis the prior day, was observably stable . . . and had such a longstanding history of being able to control his fluids, [he] did not believe [Plaintiff] would require dialysis prior to March 7, 2005." (Id. ¶ 13). Defendant Tinker submits that, if an urgent need arose, he knew that Plaintiff could receive outside treatment. (Id.).

complaints. Simply put, the record does not support the conclusion that, in the days preceding Plaintiff's March 7, 2005 MCG transfer, Defendants subjectively knew of a risk of serious harm to Plaintiff and disregarded that risk.

Turning to the "gross negligence" prong of the Goebert deliberate indifference analysis, nothing in the record suggests that, in the days following Plaintiff's incarceration at ASMP, the medical treatment afforded by Defendants was improper, let alone that Defendants followed a course of action that was "more than gross negligence." Examining the factors set forth in Goebert, 510 F.3d 1327, the Court concludes that, because Defendants were familiar with Plaintiff as a dialysis patient (doc. no. 27, Ex. A, ¶ 4, Ex. B, ¶ 4), the seriousness of Plaintiff's medical need is not debatable. As to the effect of the delayed dialysis treatment, the record does not indicate that Plaintiff's medical condition significantly worsened due to the decision to schedule Plaintiff's first dialysis treatment following incarceration at ASMP for March 7, 2005. Unlike Goebert, after Plaintiff complained about difficulty breathing on Sunday March 6, 2005, he was examined by multiple healthcare providers and transferred to MCG for treatment.[15]  (Id., Ex. A-1, pp. 7-8). Although

---

[15]In that case, the plaintiff argued, *inter alia*, that a defendant showed deliberate indifference to her serious medical need by failing to respond to her "complaint" concerning leaking amniotic fluid for more than a week. Goebert, 510 F.3d at 1327. Addressing the plaintiff's claims, the Eleventh Circuit held, *inter alia*, that the information in the plaintiff's "complaint" gave the defendant abundant reason to believe that her medical need was serious and that the defendant had a duty to "look into the matter." Id. at 1327-28. Furthermore, the Eleventh Circuit determined that the evidence supported the conclusion that the delay in treatment caused the plaintiff to lose her child. Id. at 1329. Conversely, here, Plaintiff was examined shortly after complaining about his condition and nothing in the record suggests that his condition significantly worsened as a result of the decision to schedule his first dialysis treatment following incarceration at ASMP for March 7, 2005.

14

Plaintiff's MCG records mention "volume overload," his MCG records also indicate, *inter alia*, that he was without distress and that Plaintiff did not exhibit difficulty breathing. (Id., Ex. A-2, pp. 5 & 8). Plaintiff was discharged from MCG on March 7, 2005 without receiving dialysis treatment,[16] instructed to continue medications, and directed to receive dialysis treatment later that day. (Id. at 5). Indeed, the fact that Plaintiff was discharged from MCG without receiving dialysis treatment severely undercuts his conclusory allegation that, due to a lack of dialysis treatment, he required emergency treatment and that he continues to suffer detrimental effects.[17] Finally, although the parties dispute the reason Plaintiff's first dialysis treatment following incarceration at ASMP was scheduled for March 7, 2005, the period of delay was small, and more importantly, Plaintiff's condition did not significantly worsen as a result of this decision.[18] As such, the record does not support the conclusion

---

[16]Nothing in the record supports Plaintiff's contention that "[MCG] did not have anyone to run [him] on the machine." (Doc. no. 31, ¶ 18).

[17]On this point, the Court notes that, while at MCG on March 7, 2005, Plaintiff was treated with nitroglycerin. (Doc. no. 27, Ex. A-2, pp. 7 & 10). Plaintiff submits that this treatment was necessary because "delay in dialysis treatment put him at a substantial risk of a fatal heart attack." (Doc. no. 35, ¶ 1). However, Plaintiff's MCG medical records do not indicate the cause or purpose of this treatment, and Plaintiff has not provided any verifying medical evidence to support his conclusory assertion. Indeed, prior to Plaintiff's incarceration at ASMP, he suffered from various medical conditions.

[18]Defendant Tinker submits, "In [his] professional opinion, there was no reason for [Plaintiff] to have a dialysis treatment on March 4, 2005, given that he had one the prior day and was clearly stable during [their] encounter. Further, the dialysis schedule was already completely full for March 4, 2005, and [he] did not have a dialysis slot available for [Plaintiff]." (Doc. no. 27, Ex. A, ¶ 10). Moreover, Defendant Tinker maintains, "With regard to [Plaintiff's] request to have a treatment on Saturday, March 5, 2005, [he] looked at the schedule and saw that it was completely full" and that the dialysis clinic was closed on Sunday, March 6, 2005. (Id. ¶¶ 8 & 11). Plaintiff alleges, "Defendants had several vacant seats in which they could have treated [him] on [March 5 or 6, 2005], but failed to act . . . ." (Doc. no. 31, p. 7). The Court need not resolve this issue when addressing the merits of

15

that, in the days preceding Plaintiff's March 7, 2005 MCG transfer, Defendants afforded Plaintiff improper medical treatment, let alone that Defendants followed a course of action that was "more than gross negligence."

In sum, Plaintiff has provided the Court with no verifying medical evidence in support of his contention that, as a result of Defendants' failure to provide him with timely dialysis treatment, he had to be transferred to MCG for emergency treatment on March 7, 2005 and continues to suffer from detrimental effects. Moreover, nothing in the record suggests that Defendants subjectively knew about a risk of serious harm to Plaintiff, disregarded that risk, or followed a course of action that was "more than gross negligence." Therefore, viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is no genuine issue as to any material fact related to his deliberate indifference claim based on the decision to schedule his first dialysis treatment after incarceration at ASMP for March 7, 2005.

## 2. The Decision to Terminate and Postpone Dialysis Treatments

Plaintiff also argues, "Due to the Defendants' actions in delaying my dialysis treatment[, he] had to have emergency vascular surgery . . . on [May 25, 2005]." (Doc. no. 31, ¶ 16). In support of this argument, Plaintiff contends that his March 7, 2005 dialysis treatment was prematurely-terminated due to "excessive bleeding" caused by "Defendants' failure to act in a timely manner in days past." (Id. ¶ 4). Plaintiff also maintains that,

---

Defendants' motion for summary judgment because the record does not indicate that Plaintiff's medical condition significantly worsened as a result of the decision to schedule his first dialysis treatment following incarceration at ASMP for March 7, 2005.

because he was not provided with a "permanent dialysis schedule" on March 7, 2005, he was forced to wait until March 10, 2005, to receive his next dialysis treatment. (Doc. no. 1, p. 10). Defendants counter that Plaintiff requested termination of his March 7, 2005 dialysis treatment due to soreness and hunger, and that they are required to honor such requests. (Doc. no. 27, p. 9). Defendants also maintain that, on March 9, 2005, Plaintiff requested that he be changed from the M/W/F Schedule to the T/T/S Schedule, even if it meant waiting until March 10, 2005 to receive his next dialysis treatment. (Id. at 10-11). Ultimately, Defendants submit that they acted reasonably, that there was no obvious risk of harm, and that Plaintiff is assigning blame for his decisions to terminate treatment and to change dialysis schedules. (Id. at 15-19).

Again, it should be noted that Plaintiff has provided the Court with no verifying medical evidence in support of his contention that, as a result of prematurely-terminated and postponed dialysis treatments, he had to undergo emergency cardiovascular surgery and continues to suffer detrimental effects. Rather, the record demonstrates that, following Plaintiff's March 7, 2005 return to ASMP, he received near constant medical attention--at no time did Defendants subjectively know about a risk of serious harm to Plaintiff or disregard that risk.[19] Upon his return to ASMP on March 7, 2005, Plaintiff was examined by a PA, who noted that Plaintiff "felt fine" and assessed Plaintiff as stable. (Id., Ex. A-1, p. 9). Although Plaintiff's March 7, 2005 dialysis treatment was terminated early, he

_____

[19]Defendants submit that, in their professional opinions, they did not see a problem with Plaintiff waiting until March 10, 2005 for his second dialysis treatment following incarceration at ASMP because he was clearly stable on March 9, 2005 and had a strong history of being able to control his fluids. (Doc. no. 27, Ex. A, ¶ 22, Ex. B, ¶10).

experienced cramping associated with achievement of his desired "dry weight" (id. at 54-55), and thus, nearly all excess fluid had been removed from Plaintiff (id., Ex. A, ¶ 21). Furthermore, during multiple examinations on March 7, 10, and 12, 2005, Plaintiff exhibited regular cardiology rhythms, normal respiratory functions, and no signs of edema, and thus, he was assessed as stable. (Id., Ex. A-1, 54-59). Plaintiff was also examined and provided with dialysis treatments on several occasions in the weeks following March 10, 2005. (Id. at 13-20 & 58-61). Notably, after complaining about chest tightness on April 10, 2005, Plaintiff was examined by a PA, who noted, *inter alia*, no signs of edema and directed Plaintiff to continue his medication. (Id. at 16). Furthermore, an electrocardiogram indicated that Plaintiff was not suffering from any acute heart problems. (Id.). Simply put, the record does not support the conclusion that, while providing dialysis treatment in the days following Plaintiff's March 7, 2005 MCG transfer, Defendants subjectively knew of a risk of serious harm to Plaintiff and disregarded that risk.

Turning again to the "gross negligence" prong of the Goebert deliberate indifference analysis, nothing in the record suggests that, in the days following Plaintiff's March 7, 2005 return to ASMP, the medical treatment afforded by Defendants was improper, let alone that Defendants followed a course of action that was "more than gross negligence." As previously discussed, the seriousness of Plaintiff's medical need is without question. Evaluating the effect of the terminated and postponed dialysis treatments, the record does not indicate that Plaintiff's medical condition significantly worsened as a result of the dialysis treatments afforded by Defendants. Unlike the plaintiff in Goebert, who voiced complaints that were not addressed, nothing in the record suggests that Plaintiff complained about his

March 7 or 10, 2005 dialysis treatments. Furthermore, the record lacks evidence supporting the conclusion that, as a result of dialysis treatment received at ASMP, Plaintiff was forced to undergo emergency cardiovascular surgery and continues to suffer detrimental effects. Once an unspecified "problem" was discovered on May 21, 2005, Plaintiff was immediately transferred to MCG for "declot and/or line placement." (Id. at 19). Although a PA later noted that the declotting was unsuccessful and that vascular surgery was necessary (id. at 20), nothing in the record attributes these difficulties to the dialysis treatment afforded by Defendants. Finally, although the parties dispute the reasons supporting Plaintiff's terminated and postponed dialysis treatments, Plaintiff's March 7, 2005 dialysis treatment was nearly complete prior to termination, the period of delay associated with his next dialysis treatment was small, and more importantly, nothing in the record indicates that his condition worsened as a result of treatments afforded by Defendants.[20] In a nutshell, the record does not support the conclusion that, in the days following Plaintiff's March 7, 2005 return to ASMP, the medical treatment afforded by Defendants was improper, let alone that Defendants followed a course of action that was "more than gross negligence."

---

[20]Defendants submit that Plaintiff requested to terminate his March 7, 2005 dialysis treatment early because his arm was sore and he was hungry. (Doc. no. 27, Ex. A, ¶ 21, Ex. B., ¶ 17). However, Plaintiff maintains that his March 7, 2005 dialysis treatment was terminated due to "excessive bleeding." (Doc. no. 31, ¶¶ 4 &18). In this regard, the record clearly indicates that Plaintiff's March 7, 2005 dialysis treatment was terminated "due to slight pain [and] slight oozing of blood." (Doc. no. 27, Ex. A-1, p. 10). Defendants also submit that, on March 9, 2005, Plaintiff requested to change dialysis schedules, even if that meant waiting until March 10, 2005 for his next dialysis treatment. (Id., Ex. A, ¶ 21, Ex. B, ¶ 10). Plaintiff contends that his March 9, 2005 dialysis treatment was postponed because he was not given a permanent dialysis schedule on March 7, 2005. (Doc. no. 1, p. 10). The Court need not resolve this issue when addressing the merits of Defendants' motion for summary judgment because the record does not indicate that Plaintiff's medical condition significantly worsened as a result of postponement of his March 9, 2005 dialysis treatment.

In sum, Plaintiff has provided the Court with no verifying medical evidence in support of his contention that, as a result of prematurely-terminated or postponed dialysis treatments, he had to undergo emergency cardiovascular surgery and continues to suffer detrimental effects. Moreover, nothing in the record suggests that, while providing dialysis treatment in the days following Plaintiff's March 7, 2005 return to ASMP, Defendants subjectively knew about a risk of serious harm to Plaintiff, disregarded that risk, or followed a course of action that was "more than gross negligence." Therefore, viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is no genuine issue as to any material fact related to Plaintiff's deliberate indifference claim based on the dialysis treatment afforded to Plaintiff following his March 7, 2005 return to ASMP.

Plaintiff has merely described dissatisfaction with dialysis treatments received at ASMP. Notably, the record demonstrates that Defendants exercised their professional medical judgment and that Plaintiff received near-constant medical attention while incarcerated at ASMP. Even assuming, *arguendo*, that Plaintiff's dialysis treatment was somehow deficient or differed from the treatment plans other caregivers would have pursued, or that Plaintiff would have preferred, these assertions alone are insufficient to generate a dispute of material fact regarding Plaintiff's claims of deliberate indifference. Differences in opinion concerning treatment fall well short of establishing deliberate indifference. See Harris, 941 F.2d at 1505; Waldrop, 871 F.2d at 1033. Indeed, allegations of negligence or malpractice do not amount to deliberate indifference. Campbell, 169 F.3d at 1363-72; Harris, 941 F.2d at 1505. Therefore, viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is no genuine issue as to any material fact and that

Defendants were not deliberately indifferent to Plaintiff's serious medical needs. Accordingly, Defendants are entitled to judgment as a matter of law.[21]

### III. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED**, Plaintiff's motion for summary judgment is **DENIED**, this civil action is **CLOSED**, and a final judgment shall be **ENTERED** in favor of Defendants.

SO ORDERED this _10_ day of March, 2008, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

---

[21]Plaintiff also argues that, based on the allegations set forth in his "affidavit in support of [his] counter-motion," he is entitled to summary judgment. (Doc. no. 31, p. 1). Although Plaintiff's "affidavit" sets forth his version of the facts, Plaintiff did not file, pursuant to Local Rule 56.1, a brief or a separate statement of material facts, wherein each statement of material fact is supported by a citation to the record. Thus, in addition to failing to show that Defendants were deliberately indifferent to his serious medical needs, Plaintiff has failed to comply with the Court's Local Rules. Accordingly, Plaintiff's motion for summary judgment is **DENIED**. See Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979) (*per curiam*) (motion may be summarily denied for failing to comply with a court's Local Rules).